**DEREK SMITH LAW GROUP, PLLC**
IAN M. BRYSON, ESQUIRE
1 Pennsylvania Plaza, Suite 4905
New York, New York 10119
Direct: (267) 857-0849
ian@dereksmithlaw.com
*Attorneys for Plaintiff Petra Christina Beter*

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PETRA CHRISTINA BETER,<br><br>     Plaintiff,<br><br> v.<br><br>DUANE BAUGHMAN,<br><br>     Defendant. | Civil Action No. 1:24-cv-00079<br><br>**AMENDED COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff PETRA BETER (hereinafter referred to as "BETER" or "Plaintiff") by and through her attorneys, DEREK SMITH LAW GROUP, PLLC, hereby complain of Defendant DUANE BAUGHMAN, upon information and belief as follows:

<u>**NATURE OF CASE**</u>

1. Plaintiff is seeking declaratory relief and damages to redress the injuries Plaintiff has suffered as a result of, *inter alia*, sexual assault, sexual harassment, discrimination, retaliation, negligence, and aiding and abetting by Defendant.

2. Plaintiff brings claims for assault and battery, intentional infliction of emotional distress, negligent infliction of emotional distress, Gender Motivated Violence Protection Act, discrimination, retaliation and aiding and abetting as claims revived under the Adult Survivors Act. Plaintiff brings claims for retaliation under the New York State Human

1

Rights Law, New York Executive Law Section 290, et seq., and the Administrative Code of the City of New York 8-107 et seq, and any and all other causes of action which are alleged and/or can be inferred from the facts set forth herein.

3. Plaintiff is seeking compensatory and punitive damages, attorney's fees, and other appropriate legal and equitable relief pursuant to statutory law, common law, and such other relief as the Court deems necessary and proper.

## PARTIES

4. Plaintiff PETRA BETER is seeking damages to redress the injuries she suffered as a result of, *inter alia,* sexual assault, sexual harassment, negligence, and aiding and abetting, by Defendant.

5. At all times material, Plaintiff is an individual woman and accomplished photographer.

6. Defendant DUANE BAUGHMAN ("BAUGHMAN")  is an individual who resides in the State of California. Defendant BAUGHMAN was candidate Bloomberg's top Media Strategist during the 2001 campaign run for Mayor of New York City.

## FACTS

7. In or around late fall of 1998, Plaintiff met DOUGLAS SCHOEN through mutual friends. The plaintiff was twenty-four years old at the time. Upon meeting Plaintiff, SCHOEN immediately attempted to romantically pursue her. Plaintiff rebuffed SCHOEN's attempts stating that she had a boyfriend and advised SCHOEN not to attempt to contact her further.

8. However, Plaintiff's then boyfriend encouraged Plaintiff to facilitate a business connection with Defendant SCHOEN given his high status in the political world. As such, Plaintiff began meeting with SCHOEN for lunch at both the Harvard Club and "44"

in the Royalton Hotel, New York City. During these meetings, SCHOEN impressed the young Plaintiff with stories of his interactions with President Clinton and a very wealthy man who was toying with the idea of running for mayor of New York City. Plaintiff would soon learn that man was Michael Bloomberg.

9. SCHOEN would call Plaintiff his "favorite confidante."

10. At all times material, Plaintiff did not enter into a romantic or sexual relationship with SCHOEN.

11. SCHOEN put Plaintiff in touch with Defendant BAUGHMAN for photography purposes.

12. On or about September 11, 2001, Plaintiff was scheduled to meet with BAUGHMAN and Defendant SKYLER for lunch to discuss a potential employment opportunity.

13. At this time, Plaintiff lived in lower Manhattan. As such, Plaintiff bore witness and photographed the terror attacks on the Twin Towers and the collapse of the South Tower on September 11, 2001. Plaintiff was left emotionally and physically injured and the meeting with BAUGHMAN and SKYLER was postponed.

14. On the evening of September 11, 2001, SCHOEN called Plaintiff advising her that someone would be reaching out to her regarding the potential employment opportunity photographing Bloomberg for the last two (2) months of his campaign. Plaintiff told SCHOEN that she was traumatized by the horrific acts of violence she witnessed earlier that day and did not think she was in the right frame of mind to work.

15. Later that evening, Defendant BAUGHMAN called Plaintiff insisting she come to Bloomberg's campaign headquarters and photograph Bloomberg the following two (2) days while he visited synagogues and police and fire staging areas. This was the first time Plaintiff had met or spoken to Defendant BAUGHMAN. Plaintiff reiterated to Defendant

BAUGHMAN that she was too traumatized to work and that the campaign should hire a different photographer.

16. Thereafter, Defendant BAUGHMAN persistently called Plaintiff over the next few days. Plaintiff advised Defendant BAUGHMAN that she was too scared to leave her home and travel around Manhattan. Moreover, Plaintiff stated there were police checkpoints to enter and leave her neighborhood and that no cars were allowed past 14th Street. In response, Defendant BAUGHMAN pressured Plaintiff to let him put her up in the Essex House where the rest of the campaign staff was staying. Plaintiff continuously declined Defendant BAUGHMAN's offers.

17. On the evening of September 13, 2001, Defendant BAUGHMAN called Plaintiff and told her that he would be picking her up from her apartment the following morning. Plaintiff rebuffed BAUGHMAN's demand that he pick her up, stating her street was blocked off. Defendant BAUGHMAN told Plaintiff, "Don't worry. I'll make it. Be ready."

18. On the morning of September 14, 2001, Defendant BAUGHMAN showed up at Plaintiff's apartment with a driver, stating the ban had been lifted. Defendant BAUGHMAN told Plaintiff he was taking her to the campaign office located in Chelsea. Defendant BAUGHMAN advised Plaintiff that she would take photographs of candidate Bloomberg arriving to thank the rescue personnel who had been using the office as a staging area.

19. Plaintiff complied and got into Defendant BAUGHMAN's car. Plaintiff, who had not left her apartment since the 9/11 terror attacks, quickly realized the mayhem that still ensued in the streets of lower Manhattan. Traffic was jammed with rescue personnel, military convoys and the New York Police Department ultimately did not allow Defendant

BAUGHMAN's car to pass. Defendant BAUGHMAN then instructed Plaintiff to get out of his car and walk with him to the campaign office on foot. Rain was pouring down; soaking Plaintiff and it became evidently clear that Defendant BAUGHMAN did not know how to get to the campaign office.

20. By the time Plaintiff and Defendant BAUGHMAN arrived at the Chelsea office approximately twenty (20) minutes later, Plaintiff was very distressed, begging Defendant BAUGHMAN, "I want to go home. You should call someone else." BAUGHMAN instructed Plaintiff to "Just wait."

21. Plaintiff took five photos of Defendant BAUGHMAN inside the Bloomberg Chelsea office on September 14, 2001. On September 14, 2001 the Bloomberg Chelsea office was set up as a staging area for first responders including NYPD, FDNY and National Guard. The office was filled with rescue workers and first responders coming in out of the rain in full rain gear. Defendant BAUGHMAN instructed Plaintiff to take photos while they were waiting for Candidate Bloomberg to arrive for a photo op with the first responders. Plaintiff walked throughout the offices and spoke with a number of the first responders and took a full roll of film, 36 frames. September 14th, 2001 was a historically significant day. It was the day President Bush spoke at the National Day of Prayer and Remembrance Service at Washington's National Cathedral and then came to New York and gave his famous bullhorn speech at Ground Zero. The National Cathedral service was broadcast live on tv in the Bloomberg Chelsea office and Plaintiff captured several images of first responders viewing the broadcast. The service began at 1pm. The television screen in the images shows the inside of the National Cathedral in Washington D.C. and the caption reads, "Breaking News Live, National Day of Prayer and

Remembrance Service, Bloomberg TV live feed, Copyright Bloomberg 1:20pm ET."
After an hour of waiting Candidate Bloomberg did not show at the Chelsea office and Defendant BAUGHMAN took Plaintiff to the campaign headquarters and subsequently to Bloomberg LP along with SKYLER where she took two rolls of Michael Bloomberg, one that she kept and developed and four days later sent to BAUGHMAN's office in San Francisco, the other roll BAUGHMAN took from her after the shoot at Bloomberg LP that day. Plaintiff kept the roll of film from the Chelsea office with the first responders and had it developed. Defendant BAUGHMAN did not ask her for this roll because it did not have any photos of Candidate Bloomberg. The photos Plaintiff took of Defendant BAUGHMAN that day are attached as Exhibit A.

22. A campaign security van then arrived to take Plaintiff and Defendant BAUGHMAN to Bloomberg's campaign headquarters located on 56th Street in New York City. Plaintiff entered the vehicle and sat two rows behind the driver. Defendant BAUGHMAN sat next to Plaintiff, pressing himself against her so much so that Plaintiff was pressed up against the van window.

23. Defendant BAUGHMAN began touching Plaintiff saying, "I'll take care of you." This continued for over an hour while Plaintiff attempted to wriggle away. Defendant BAUGHMAN asked Plaintiff to have dinner with him that evening and to stay at the Essex House. Plaintiff declined and said that she had plans. Defendant BAUGHMAN became visibly angry and stopped speaking to or touching Plaintiff for the remainder of the car ride.

24. Approximately twenty (20) minutes later, Plaintiff and Defendant BAUGHMAN arrived at Bloomberg's empty campaign headquarters. There, BAUGHMAN introduced Plaintiff

to EDWARD SKYLER. Defendant BAUGHMAN and SKYLER led Plaintiff into a small room and advised her to wait there by herself.

25. Approximately ten (10) to fifteen (15) minutes later, Defendant BAUGHMAN and SKYLER returned and escorted Plaintiff through the empty office and into a back room with worktables and a kitchen.

26. There, SKYLER offered Plaintiff a cup of coffee. Plaintiff asked for a Diet Coke instead and SKYLER directed Plaintiff to the fridge stating, "There may be a Coke on the bottom shelf." Then, SYKLER exited the room to answer a phone call. As Plaintiff bent down to look for the Coke at the bottom shelf of the refrigerator, Defendant BAUGHMAN suddenly came behind Plaintiff, grabbed Plaintiff's head and pushed his crotch into the right side of her face. Plaintiff felt BAUGHMAN's penis push into her face, close to her mouth. BAUGHMAN pushed Plaintiff's head toward him like he wanted her to perform oral sex and said, "You want it." BAUGHMAN pushed Plaintiff to the floor and then got on top of her. Plaintiff started screaming and he got off of her. When Plaintiff was on the floor, she looked up behind her and BAUGHMAN was standing over her. SKYLER quickly ran back into the room, and Plaintiff turned her head and looked up at SKYLER, who was standing approximately 10 feet away. BAUGHMAN put his hands in the air and started backing away from Plaintiff, and SKYLER said to Plaintiff, "Let's go get some coffee." Plaintiff got up, and BAUGHMAN and SKYLER stood and watched Plaintiff getting up. Plaintiff walked directly toward SKYLER and he quickly walked her through the empty office, out into the hallway, into the elevator, and out of the building onto the street. Neither of them said anything.

27. Plaintiff, too stunned to speak, followed SKYLAR into the elevator downstairs and across the street to a deli. Plaintiff realized that she had left in such a hurry that she left her bag with her cell phone, wallet and camera behind. Despite this, Plaintiff told SKYLER, "I'm not ready to go back." Plaintiff and SKYLER sat silently on a bench in the deli for approximately five (5) minutes until SKYLER said, "We should really head back. Bloomberg could be there waiting for us." Plaintiff was in distress but felt she had no choice and followed SKYLER back into Bloomberg's headquarters.

28. Upon Plaintiff's return, Defendant BAUGHMAN advised SKYLER that Bloomberg wanted Plaintiff to photograph him at Bloomberg LP, not the headquarters. Further, Defendant BAUGHMAN advised that he, Plaintiff, and SKYLER needed to walk over to Bloomberg LP immediately. Neither Defendant BAUGHMEN nor SKYLER mentioned Defendant BAUGHMAN's sexual assault of Plaintiff.

29. Upon their arrival at Bloomberg LP, Defendant BAUGHMAN advised Plaintiff not to tell any of Bloomberg's staff that she had come to Bloomberg LP. Moreover, Defendant BAUGHMAN told Plaintiff not to speak to Bloomberg's secretary Patti Harris. Plaintiff found this need for secrecy unsettling and worrisome.

30. Then, Defendant BAUGHMAN brought Plaintiff and SKYLER to Bloomberg's office where he was sitting at his desk next to his secretary, Patti Harris. Defendant BAUGHMAN introduced Plaintiff to candidate Bloomberg who was visibly irritated that he had been kept waiting and Plaintiff vigorously apologized for her tardiness. Candidate Bloomberg shook his head as Plaintiff proceeded to tell him that she was not acting like herself since she had very recently witnessed the 9/11 terror attacks. Candidate Bloomberg continued blankly staring at Plaintiff as she physically shook due to nerves

8

and the fact that the man that had recently sexually assaulted her was still in the room. Plaintiff continued offering apologies. Then, Candidate Bloomberg suddenly said, "Let's get to work."

31. Plaintiff, terrified and desperate to leave, turned to Ms. Harris (the only other woman in the room) and whispered, "I'm sorry. I need to tell you something. Something just happened to me—" Ms. Harris cut Plaintiff off stating, "I don't care what happened. Whatever you do, just stop saying you're sorry!" Plaintiff, feeling as though she was going to faint, desperately scanned the room for help only to see candidate Bloomberg, Defendant BAUGHMAN, and SKYLER glaring at her. Plaintiff mustered the strength to take out her camera and clear off candidate Bloomberg's desk.

32. Thereafter, Plaintiff realized her roll of film was fully used. Plaintiff proceeded to walk to the back room behind candidate Bloomberg's desk and began packing up her belongings. Defendant BAUGHMAN followed Plaintiff and insisted she give him the film for "safe keeping." Plaintiff wanted to keep the film but was desperate to escape and get as far away from Defendant BAUGHMAN as she could. As such, Plaintiff handed over the film to Defendant BAUGHMAN who put it in his pocket. When Defendant BAUGHMAN noticed that Plaintiff was packing up, he said, "Why are you leaving? You're not finished." Plaintiff began crying and said, "I can't take it. I don't care." Defendant BAUGHMAN frantically began shushing Plaintiff and said, "Calm down. Get a hold of yourself. You'll be fine. Just get through this." Plaintiff, who felt herself about to faint, sat down on a couch as Defendant BAUGHMAN paced around her. Plaintiff again expressed her wish to leave and return home. BAUGHMAN told Plaintiff, "It'll take five minutes. Stay and finish."

33. Plaintiff walked back out to take a second roll of film. After shooting the second roll of film, Plaintiff began to gather her belongings when Defendant BAUGHMAN ordered her to wait for him by the elevators. Defendant BAUGHMAN walked Plaintiff out of the building and hailed her a cab. Plaintiff went straight home.

34. On or about September 15, 2001, SKYLER called Plaintiff and left a voice message asking her to call him. Plaintiff did not call SKYLER back. Instead, Plaintiff called SCHOEN and said they needed to talk.

35. On or about September 17, 2001, Plaintiff met SCHOEN at a restaurant in Midtown. As soon as SCHOEN saw Plaintiff he asked, "How did it go with Bloomberg?" Plaintiff hesitated to reply and before Plaintiff had the chance to respond, SCHOEN asked "What happened? Did Duane do something to you? What did Duane do to you?"

36. Plaintiff stood up from the table and began to explain and demonstrate to SCHOEN what had happened to her. SCHOEN then said "Don't tell anyone about this. You still want to work for Bloomberg, don't you?

37. SCHOEN then angrily said, "I told him not to touch you." Look, this kind of thing happens all the time. He's (meaning BAUGHMAN) has done this kind of thing before."

38. For 20 years Plaintiff has opposed and objected to the sexual assault and sexual harassment she suffered at the hands of Defendant BAUGHMAN.

39. On June 6, 2023, in retaliation for Plaintiff's opposition and objections to BAUGHMAN's sexual assault and sexual harassment, BAUGHMAN maliciously sued Plaintiff for defamation.

40. BAUGHMAN's sexual assault of Plaintiff described in paragraph 26 above constitutes a sexual offense as defined in article one hundred thirty of the penal law.

41. Sexual assault and rape constitute crimes of violence against women and demonstrate hatred toward women as a group.

**AS A FIRST CAUSE OF ACTION**
**FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

42. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

43. Defendant's behavior was extreme and outrageous to such extent that the action was atrocious and intolerable in a civilized society.

44. Defendant's conduct was so outrageous in character and extreme in degree as to go beyond all possible bounds of decency.

45. Defendant caused Plaintiff to fear for her own safety.

46. Defendant's breach of his duties to Plaintiff caused her to suffer numerous injuries as set forth herein.

47. As a result of Defendant's acts, Plaintiff has been damaged in an amount to be determined at the time of trial.

**AS A SECOND CAUSE OF ACTION**
**FOR GENDER MOTIVATED VIOLENCE PROTECTION ACT**

48. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

49. N.Y. ADC. LAW § 8-903 states in relevant part "For purposes of this chapter:

   a. "Crime of violence" means an act or series of acts that would constitute a misdemeanor or felony against the person as defined in state or federal law or that would constitute a misdemeanor or felony against property as defined in state or federal law if the conduct presents a serious risk of physical injury to another,

whether or not those acts have actually resulted in criminal charges, prosecution, or conviction.

b. "Crime of violence motivated by gender" means a crime of violence committed because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender.

50. N.Y. ADC. LAW § 8-904 : NY Code – Section 8-904: Civil Cause of Action states in relevant part "Except as otherwise provided by law, any person claiming to be injured by an individual who commits a crime of violence motivated by gender as defined in section 8-903 of this chapter, shall have a cause of action against such individual in any court of competent jurisdiction for any or all of the following relief: 1. Compensatory and punitive damages; 2. Injunctive and declaratory relief; 3. Attorneys' fees and costs; 4. Such other relief as a court may deem appropriate."

51. Defendant's conduct constitutes crimes of "violence motivated by gender" under The Victims of Gender-Motivated Violence Protection Act ("VGMVPA").

52. As a result of Defendant's acts, Plaintiff has been damaged in an amount to be determined at the time of trial.

<strong><u>AS A THIRD CAUSE OF ACTION<br>FOR ASSAULT AND BATTERY</u></strong>

53. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

54. The aforesaid occurrences and resultant injuries to Plaintiff was caused by reason of the intent, carelessness and recklessness of Defendant BAUGHMAN, did suddenly and without provocation, did physically rape, assault and batter Plaintiff, herein causing Plaintiff to sustain damages; in that Defendant BAUGHMAN did conduct himself in a

12

wanton, willful, reckless and heedless manner without regard to the safety of the Plaintiff herein; in that said Defendant was physically abusive; in behaving in a disorderly manner; in using unnecessary, excessive and unlawful touching against the plaintiff; in willfully and maliciously assaulting and battering the Plaintiff herein.

55. § 214-j of the Civil Practice Law and Rules provides as follows: certain sexual offense actions. Every civil claim or cause of action brought against any party alleging intentional or negligent acts or omissions by a person for physical, psychological, or other injury or condition suffered as a result of conduct which would constitute a sexual offense as defined in article one hundred thirty of the penal law committed against such person who was eighteen years of age or older, […] which is barred as of the effective date of this section because the applicable period of limitation has expired, […] is hereby revived, and action thereon may be commenced not earlier than six months after, and not later than one year and six months after the effective date of this section. In any such claim or action, dismissal of a previous action, ordered before the effective date of this section, on grounds that such previous action was time barred, and/or for failure of a party to file a notice of claim or a notice of intention to file a claim, shall not be grounds for dismissal of a revival action pursuant to this section.

56. As a result of Defendant BAUGHMAN's acts of assault and battery, Plaintiff has been damaged in an amount to be determined at the time of trial.

**AS A FOURTH CAUSE OF ACTION**
**FOR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

57. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

58. Defendant's behavior was extreme and outrageous to such extent that the action was atrocious and intolerable in a civilized society.

59. Defendant had a duty of care to Plaintiff to not assault or rape her during the course of their employment.

60. Defendant violated that duty.

61. Defendant's breach of duty caused Plaintiff to suffer numerous injuries as set forth herein.

62. As a result of Defendant's acts, Plaintiff has been damaged in an amount to be determined at the time of trial.

**AS A FIFTH CAUSE OF ACTION**
**FOR AIDING & ABETTING**
**UNDER NEW YORK STATE LAW**

63. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

64. New York State Executive Law §296(6) further provides that "It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so."

65. Defendant engaged in an unlawful discriminatory practice by aiding, abetting, compelling and/or coercing the discriminatory behavior as stated herein.

**AS A SIXTH CAUSE OF ACTION**
**FOR RETALIATION**
**UNDER NEW YORK STATE LAW**

66. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

67. New York State Executive Law § 296(7) provides that it shall be an unlawful discriminatory practice: "For any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he has opposed any practices forbidden under this article."

68. Defendant engaged in an unlawful discriminatory practice by retaliating against Plaintiff with respect to the terms, conditions or privileges of her employment because of her opposition to the unlawful employment practices of Defendant.

69. Defendant violated the above and Plaintiff suffered numerous damages as a result.

**AS AN SEVENTH CAUSE OFACTION**
**FOR DISCRIMINATION**
**UNDER THE NEW YORK CITY ADMINISTRATIVE CODE**

70. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

71. The Administrative Code of City of NY § 8-107 [1] provides that "It shall be an unlawful discriminatory practice: "(a) For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, sexual orientation or alienate or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment."

72. Defendant engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Title 8, by creating and maintaining discriminatory working conditions and a hostile work environment, and otherwise discriminating against the Plaintiff because of her sex/gender.

15

73. Plaintiff hereby makes a claim against Defendants under all of the applicable paragraphs of New York City Administrative Code Title 8.

74. Defendant violated the above and Plaintiff suffered numerous damages as a result.

**AS A EIGHTH CAUSE OF ACTION**
**FOR AIDING AND ABETTING**
**UNDER THE NEW YORK CITY ADMINISTRATIVE CODE**

75. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

76. The New York City Administrative Code Title 8, §8-107(6) provides that it shall be unlawful discriminatory practice: "For any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter, or attempt to do so."

77. Defendant engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Title 8, §8-107(6) by aiding, abetting, inciting, compelling and coercing the above discriminatory, unlawful and retaliatory conduct.

78. Defendant violated the above and Plaintiff suffered numerous damages as a result.

**AS A NINTH CAUSE OF ACTION**
**FOR DISCRIMINATION**
**UNDER THE NEW YORK CITY ADMINISTRATIVE CODE**

79. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

80. Section 8-107(19), entitled Interference with protected rights provides that: "It shall be an unlawful discriminatory practice for any person to coerce, intimidate, threaten or interfere with, or attempt to coerce, intimidate, threaten or interfere with, any person in the exercise or enjoyment of, or on account of his or her having aided or encouraged any

16

other person in the exercise or enjoyment of, any right granted or protected pursuant to this section."

81. Defendant violated the above section as set forth herein and Plaintiff suffered numerous damages as a result.

**WHEREFORE,** Plaintiff respectfully requests that this Court enter judgment in an amount which exceeds the jurisdiction of all lower courts for all damages including but not limited to compensatory damages, punitive damages, statutory damages, attorney's fees, costs, interest and all other damages as are just and proper to remedy Defendant's unlawful sexual abuse and harassment of Plaintiff.

**AS A TENTH CAUSE OF ACTION**
**FOR RETALIATION**
**UNDER NEW YORK STATE LAW**

82. Plaintiff repeats, reiterate and reallege each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

83. New York State Executive Law § 296(7) provides that it shall be an unlawful discriminatory practice: "For any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he has opposed any practices forbidden under this article."

84. Defendant engaged in an unlawful discriminatory practice by retaliating against Plaintiff with respect to the terms, conditions or privileges of her employment because of her opposition to the unlawful employment practices of Defendants.

85. Defendant violated the above and Plaintiff suffered numerous damages as a result.

**AS AN ELEVENTH CAUSE OF ACTION**
**FOR RETALIATION**
**UNDER THE NEW YORK CITY ADMINISTRATIVE CODE**

86. Plaintiff repeats, reiterate and reallege each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

87. The New York City Administrative Code provides that it shall be an unlawful discriminatory practice for an employer to retaliate against any person because such person has opposed any unlawful employment practices.

88. Defendant engaged in an unlawful discriminatory practice in violation of the New York City Administrative Code by retaliating against Plaintiff because of her opposition to Defendant's sexual assault and sexual harassment.

89. Plaintiff hereby makes a claim under all applicable paragraphs of New York City Administrative Code Title 8.

90. Defendant violated the above and Plaintiff suffered damages as a result.

**<u>JURY DEMAND</u>**

Plaintiff demands a jury trial on all issues to be tried.

Dated: May 6, 2024
New York, New York

Respectfully submitted,

DEREK SMITH LAW GROUP, PLLC

*/s/ Ian M. Bryson, Esquire*
Ian M. Bryson, Esq.
One Penn Plaza, Suite 4905
New York, New York 10119